**Lee Warren EISENHAUER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 149–85.**

Court of Criminal Appeals of Texas,
En Banc.

March 23, 1988.

W. Scott Carpenter, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Timothy G. Taft, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., and Alfred Walker, First Asst., State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

McCORMICK, Judge.

This appeal is from a conviction for possession of a controlled substance, to-wit: cocaine. Following appellant's plea of nolo contendre before the court, punishment was assessed at six years' imprisonment, probated, and a fine of $2,000.

Prior to the bench trial, appellant filed a pretrial motion to suppress. Only one police officer testified at the hearing and the motion was overruled. Thereafter, appellant entered his nolo contendre plea and the evidence seized as a result of the search was utilized to support his plea and the judgment. See Article 1.15, V.A.C.C.P. After conviction, appellant appealed only the denial of the pretrial motion to suppress, which was permissible under Article 44.02, V.A.C.C.P.[1]

In *Eisenhauer v. State*, 657 S.W.2d 184 (Tex.App.—Houston [1st Dist.] 1983) (hereinafter *Eisenhauer I*), the same search and seizure being tested before the Court today was the subject of a federal constitutional challenge. The Court of Appeals found that the arrest of the appellant was not supported by probable cause and, as a result, the fruits of the subsequent search were inadmissible. The decision was based solely on federal constitutional grounds, to which the Court of Appeals incorrectly applied the rule of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). This Court granted review of the *Eisenhauer I* decision in *Eisenhauer v. State*, 678 S.W.2d 947 (Tex.Cr.App.1984) (hereinafter *Eisenhauer II*). Presiding Judge

Onion, writing for the majority, concluded that the Court of Appeals' application of the *Aguilar* two-prong test was erroneous, as the federal law rested on the rule of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, rehearing denied, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983), which required review of the totality of circumstances. This Court was careful to point out that both *Eisenhauer I* and *Eisenhauer II* rested entirely upon federal grounds.

After reversing the Court of Appeals in *Eisenhauer II*, this Court remanded the case for consideration of appellant's grounds of review based on state law. The remand resulted in yet another decision styled *Eisenhauer v. State*, 684 S.W.2d 782 (Tex.App.—Houston [1st Dist.] 1984) (hereinafter *Eisenhauer III*). In *Eisenhauer III*, the Court of Appeals was faced with the task of determining whether probable cause for the search and seizure existed under Texas law. In concluding that the arrest was illegal, the Court of Appeals again applied the analysis of *Aguilar v. Texas*, supra. From this ruling, the State filed a petition for discretionary review which was granted by this Court to determine: (1) whether appellant sufficiently preserved State law grounds for review; (2) whether it was error for the Court of Appeals to apply the rule in *Aguilar* to probable cause determinations based on State law, and (3) whether probable cause existed under Texas law.[2] We now reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

The first point that must be addressed is whether appellant sufficiently preserved the State law point of error for review. Before his trial at the bench, appellant filed a written motion to suppress. It stated, inter alia, that: "Defendant was arrested without a warrant and without probable cause in violation of the IV, V, and XIV Amendments to the Constitution

---

1. We have adopted the succinct statement of facts presented by Presiding Judge Onion in this Court's prior opinion.

2. In light of the Court's disposition of the issues, it becomes unnecessary for us to reach a fourth point of error presented by the State as to whether appellant gave consent to the search in question.

of the United States and in violation of the laws and Constitution of the State of Texas." At the hearing on the motion, appellant's attorney objected to the arrest only on federal grounds, stating: "We are dealing with Draper–Aguilar–Spinelli situations...." The State argues the above quoted language, even taken in light of the written motion, is insufficient to preserve the error for review on appeal.

Though it has long been the rule that a general or imprecise specific objection is insufficient to preserve error for appeal, where the grounds of the objection are obvious to the court or the opposing counsel, the error will not be waived. *Carter v. State,* 717 S.W.2d 60 (Tex.Cr.App.1986); *Samuel v. State,* 688 S.W.2d 492 (Tex.Cr. App.1985); *Zillender v. State,* 557 S.W.2d 515 (Tex.Cr.App.1977). We find this latter exception to be controlling in the case at bar. The clear thrust of appellant's challenge was directed toward the propriety of the warrantless arrest and subsequent search. Article I, Section 9, of the Texas Constitution is directly on point. Failure to explicitly state "Art. I, § 9" should not be an impediment to review, particularly where, as here, this Court remanded the case to the Court of Appeals for the specific purpose of hearing appellant's state law points of error.

It has also been held that a timely filed motion to suppress will be sufficient to preserve error even without oral argument at the suppression hearing. *Vicknair v. State,* 670 S.W.2d 286 (Tex.App.—Houston [1st Dist.] 1984, review refused). It logically follows that a motion to suppress will be sufficient to preserve an alleged error where the oral argument covers some, but not all, of the grounds raised in the motion. This is not like the situation presented in *Nelson v. State,* 607 S.W.2d 554 (Tex.Cr. App.1980), in which this Court held the State law grounds urged by the defendant for the first time on appeal had not been properly preserved for review since both the objection *and* the motion to suppress were based *solely* on federal grounds. The State's first ground of review is overruled.

The State next poses the following ground of review: "The First Court of Appeals erred in holding that under Texas law probable cause based upon hearsay must satisfy the two-prong test of *Aguilar v. State* (sic), 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)."

This case presents the Court with the first clear cut opportunity since the United States Supreme Court handed down *Illinois v. Gates,* supra, to establish a uniform guideline for determining the existence of probable cause under the constitution and laws of the State of Texas. While numerous cases have dealt with probable cause determinations, our research indicates the vast majority have dealt solely with federal constitutional issues. Very few cases presented before this Court have sought redress on State law grounds, and even fewer have resulted in decisions based upon the independent law of the State of Texas. See e.g., *Marquez v. State,* 725 S.W.2d 217 (Tex.Cr.App.1987); *Ware v. State,* 724 S.W.2d 38 (Tex.Cr.App.1986); *Cassias v. State,* 719 S.W.2d 585 (Tex.Cr. App.1986).

The opinion of the Court of Appeals in *Eisenhauer III* relies on the Aguilar–Spinelli analysis, despite the existence of a contrary federal standard. It is important to note that the Court of Appeals cites no authority for this conclusion.[3] Moreover, research indicates that this Court has never stepped forward to adopt affirmatively the two-pronged Aguilar–Spinelli test as THE method of assessing probable cause under the constitution and laws of the State of Texas.[4] Finding valid precedent lacking, it is up to this Court to make a pronouncement as to the proper State model for assessing probable cause. In doing so, we must analyze the nature and extent of the

---

3. Indeed, this Court, in *Eisenhauer II,* specifically reserved judgment on the assertion of the Court of Appeals in *Eisenhauer I* that Texas followed Aguilar–Spinelli.

4. In *Marquez v. State,* supra, it was stated that "this state has always used Aguilar–Spinelli." In that case the Court found it unnecessary to address the question of which test would be used in Texas as the affidavit in question was found to satisfy both *Aguilar* and *Gates.*

protections offered by the Texas Constitution, the statutory pronouncements of the Legislature and the interpretive caselaw.

An examination of Article I, Section 9, supra, reveals that it is virtually identical to its federal constitutional counterpart, the Fourth Amendment. Article I, Section 9 reads as follows:

"The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures and searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation."

The Fourth Amendment states:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article I, Section 9 of the Constitution of this State, and the Fourth Amendment of the Federal Constitution are, in all material aspects, the same. *Brown v. State*, 657 S.W.2d 797 (Tex.Cr.App.1983); *Crowell v. State*, 147 Tex.Cr.R. 299, 180 S.W.2d 343 (1944); *Daniel v. State*, 704 S.W.2d 952 (Tex.App.—Fort Worth 1986). The arguments for greater protections advanced here must be addressed on the basis of interpretive caselaw or legislative pronouncements.

A review of the procedures used by this Court in the past for determining probable cause provides little, if any, guidance. During the period of time between *Aguilar*

(1964) and *Gates* (1983), this State followed the lead of the United States Supreme Court and tacitly applied the Aguilar–Spinelli test to challenges based both on federal and state law. See e.g. *Jones v. State*, 640 S.W.2d 918 (Tex.Cr.App.1982); *Green v. State*, 615 S.W.2d 700 (Tex.Cr.App.1980); *Kleasen v. State*, 560 S.W.2d 938 (Tex.Cr. App.1977). However, the line of cases following the Aguilar–Spinelli model cannot be said to demonstrate, in and of themselves, judicial preference for a broader interpretation of Article I, Section 9 which provides greater protections than the Fourth Amendment. As this Court stated in *Brown v. State*, supra: "We ... decline [defendant's] invitation to attach to Article I, Section 9 of our Texas Constitution a more restrictive standard of protection than provided by the Fourth Amendment." See also, *Osban v. State*, 726 S.W.2d 107 (Tex.Cr.App.1986); *Daniel v. State*, supra; *Andrada v. State*, 695 S.W.2d 230 (Tex. App.—Corpus Christi 1985); *Kann v. State*, 694 S.W.2d 156 (Tex.App.—Dallas 1985).

Argument that this Court has adopted Aguilar–Spinelli by implication is also without merit. Lacking a positive pronouncement adopting Aguilar–Spinelli, it can be argued with equal force that this Court has applied the two-pronged test only because federal law demanded it.[5] The fact that this Court has consistently applied the totality of the circumstances analysis to probable cause challenges since *Gates* supports this conclusion.[6] As caselaw fails to provide a clear answer to the question, an examination of the relevant statutory authority is appropriate.

In deciding there was insufficient probable cause to support the arrest in this case,

---

5. Take the pre-*Gates* decision *Wright v. State*, 646 S.W.2d 460 (Tex.Cr.App.1983). In testing the sufficiency of an affidavit, the Court noted: "We must be ever mindful that we stay within the boundaries of constitutional requirements as prescribed by the United States Supreme Court in *Aguilar.*"

6. Both in cases based solely on federal grounds, see e.g., *Angulo v. State*, 727 S.W.2d 276 (Tex.Cr. App.1987); *Armstrong v. State*, 718 S.W.2d 686 (Tex.Cr.App.1985); *Bellah v. State*, 653 S.W.2d 795 (Tex.Cr.App.1983), and cases based on state

and federal grounds, see e.g., *Hennessy v. State*, 660 S.W.2d 87 (Tex.Cr.App.1983), and cases in which the record does not reflect whether state or federal grounds were determinative, see e.g., *Thomas v. State*, 701 S.W.2d 653 (Tex.Cr.App. 1985); *Whaley v. State*, 686 S.W.2d 950 (Tex.Cr. App.1985); *Glass v. State*, 681 S.W.2d 599 (Tex. Cr.App.1984); *Spencer v. State*, 672 S.W.2d 451 (Tex.Cr.App.1984); *Wright v. State*, 646 S.W.2d 460 (Tex.Cr.App.1983); cf. *Marquez v. State*, supra.

the Court of Appeals specifically relied on Article 18.01(b), V.A.C.C.P. In effect, holding that "... the two-pronged Aguilar test must be met." In support of their position, the Court of Appeals cites *Winkles v. State*, 634 S.W.2d 289 (Tex.Cr.App.1982), and *Glass v. State*, 681 S.W.2d 599 (Tex.Cr. App.1984). Though the entire analysis in *Winkles v. State*, supra, is based on the requirements of *Aguilar*, the opinion contains no mention of any independent state grounds of review. Therefore, it cannot be said to be persuasive authority to a claim based on state law. Moreover, the citation of *Glass v. State*, supra, actually undermines the position of the Court of Appeals since *Gates*, and not *Aguilar*, is mentioned as an example of what is necessary to establish probable cause.

A comparison of the language of Article 18.01, supra, with the language of *Aguilar* reveals that the statute neither follows nor incorporates the two-prong test. Article 18.01(b) reads:

"No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance. A sworn affidavit setting forth facts establishing probable cause shall be filed in every instance in which a search warrant is requested...."

*Aguilar* states:

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed was 'credible' or his information 'reliable.' "

(Citations omitted). *Aguilar v. State*, supra, 84 S.Ct. at 1514.

In his brief, appellant asserts:

"[T]he *sufficient basis* for a finding of probable cause referred to in *Aguilar* is the historic *Aguilar* test. The use of the words *'sufficient facts'* in the 1965 amendments to Article 18.01 accompanied by the commentaries patently establishes a legislative intent to incorporate *Aguilar* as part of independent state law."

We find this argument neither persuasive nor sound. While the Legislature modified the language of Article 18.01 in 1965 after the *Aguilar v. Texas* decision by the Supreme Court, it does not necessarily follow that the Legislature intended to adopt the *Aguilar* two-prong analysis.[7] If anything, these actions are congruous with a pattern of following the lead of the United States Supreme Court in interpreting search and seizure issues.

For authority, appellant refers almost exclusively to the commentaries that accompany Article 18.01, supra.[8] It is true that Judge Morrison in this "Interpretive Commentary" under Article 18.01 observed that the Supreme Court had recently invalidated some Texas convictions because the affidavits for search warrants "did not contain sufficient facts to satisfy the magistrate that probable cause did in fact exist...." And it is likewise true that Presiding Judge Onion in his "Special Commentary" cites *Aguilar;* but he confines his reference to the basic requirement of *Aguilar* that "there must be sufficient facts present...." Nowhere do Judge Morrison or Judge Onion mention the two prongs of *Aguilar* or make any statement to the effect that such analysis was intended to be incorporated in the statute.

This Court had the opportunity to interpret Article 18.01(b), supra, in light of *Aguilar* in *Hennessy v. State*, 660 S.W.2d 87 (Tex.Cr.App.1983). In *Hennessy*, the

---

7. After all, in *Aguilar v. Texas*, supra, the Supreme Court found the then-existing Texas probable cause analysis violative of the federal Constitution. It should surprise no one that the Legislature acted to bring State law into line with the constraints of the United States Constitution.

8. We quote liberally from the State's Attorney's brief on this issue.

defendant alleged that a search warrant was invalid because the underlying affidavit "failed to satisfy the probable cause requirements of *Aguilar v. Texas ... and Art. 18.01(b), V.A.C.C.P.*" This Court held that the affidavit was sufficient under the *Gates* analysis. We find the reasoning of *Hennessy* sound and reaffirm that decision. *Gates'* standards and principles should be applied in determining whether the demands of Article 18.01(b) have been met.[9]

The application of *Gates* is in no way repugnant to Article 18.01, supra. The ultimate inquiry of Article 18.01 concerns the existence of probable cause, which must be established by "sufficient" and "substantial" facts. *Aguilar v. Texas*, supra; *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *Illinois v. Gates*, supra, do not change the basic underlying rule. The only things that have changed are the measures which the Supreme Court created to aid in arriving at a determination of the existence of sufficient facts to show probable cause. Under Aguilar–Spinelli, the measure was the two-prong test. In *Gates*, the measure is the totality of the circumstances. Only the methodology of determining if the basic rule has been satisfied has changed, not the basic rule itself. *Gates*, like Article 18.01, continues the demand for sufficient and substantial facts.

■ The fact that the arrest in the instant case was made without a warrant is irrelevant to the probable cause analysis. The totality of the circumstances approach applies to warrantless as well as warrant seizures of persons and property. *United States v. Mendoza, et al.*, 722 F.2d 96 (5th Cir.1983); *Angulo v. State*, 727 S.W.2d 276 (Tex.Cr.App.1987); *Whaley v. State*, 686 S.W.2d 950 (Tex.Cr.App.1985); *Eisenhauer v. State*, 678 S.W.2d 947 (Tex.Cr.App.1984).

It is to be remembered that adoption of the analysis of *Gates* does not mean abandoning Aguilar–Spinelli. *Gates* did not dis-

pense with the two requirements used in the Aguilar–Spinelli test. Rather, in *Illinois v. Gates*, supra, the United Sates Supreme Court criticized the strict application of the two prongs of Aguilar–Spinelli, stating that although the veracity and basis of knowledge of the informant are highly relevant factors:

"These elements are not to be understood as entirely separate and independent requirements to be rigidly exacted in every case. (103 S.Ct. at 2327).

\*     \*     \*     \*     \*     \*

"Instead they are better understood as relevant considerations in the totality of circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some indicia of reliability. (103 S.Ct. at 2329)."

See also, *Whaley v. State*, supra; *Hennessy v. State*, supra.

In conclusion, *Aguilar* was not followed in Texas in order to satisfy Article I, Section 9 of the Texas constitution or Article 18.01, V.A.C.C.P.; it was followed because federal law demanded it. Federal law no longer demands it. In this area, the laws and constitution of the State of Texas impose no greater restrictive standard, leaving the Texas courts free to follow the lead of the Supreme Court of the United States. There being no binding authority to the contrary, today's opinion is made to stay in step with the federal constitutional model for probable cause determinations.

The duty of the reviewing court is to look to the totality of the circumstances to determine if there exists a substantial basis for concluding that probable cause existed at the time of the questioned action. *Angulo v. State*, supra, at 278. In *Eisenhauer II*, applying the totality of the circumstances analysis to appellant's federal

---

9. The *Hennessy* decision has been widely recognized by the Courts of Appeals as adopting *Gates* into Texas jurisprudence. See e.g., *Ellis v. State*, 722 S.W.2d 192 (Tex.App.—Dallas 1986); *Roldan v. State*, 698 S.W.2d 741 (Tex.App.—Beaumont 1985); *Correll v. State*, 696 S.W.2d

297 (Tex.App.—Fort Worth 1985); *Andrada v. State*, 695 S.W.2d 230 (Tex.App.—Corpus Christi 1985); *Elliot v. State*, 681 S.W.2d 98 (Tex.App.—Houston [14th Dist.] 1984), aff'd 687 S.W.2d 359 (Tex.Cr.App.1985); *Garcia v. State*, 676 S.W.2d 202 (Tex.App.—Corpus Christi 1984, pet. ref'd).

constitutional claim, this Court concluded that there was a substantial basis for determining probable cause in the arrest and search of the appellant. It logically follows that there is no necessity for another remand to the Court of Appeals.

The judgment of the Court of Appeals is reversed and the judgment of the trial court affirmed.

ONION, Presiding Judge, concurring.

I concur in the opinion by Judge McCormick. It is with reluctance that I add another opinion to those already extant in this cause. I am compelled to do so in view of the serious misinterpretation by the dissenting opinions of my Special Commentary to Article 18.01, V.A.C.C.P., written more than 22 years ago. Thank God I am still around to prevent my commentary from being used to mean something that was never intended.

Article 304, V.A.C.C.P. (1925), provided:

"A 'search warrant' is a written order, issued by a magistrate, and directed to a peace officer, commanding him to search for personal property, and to seize the same and bring it before such magistrate, or it is a like written order, commanding a peace officer to search a suspected place where it is alleged stolen property is commonly concealed, or implements kept for the purpose of being used in the commission of any designated offense."

An examination of the early drafts of the State Bar Committee on the Revision of the Code of Criminal Procedure (1925) on which Judges Erisman, Morrison and I served showed that in 1962 and 1963 it was proposed to bring Article 304 forward unchanged as Article 18.01 of any new Code of Criminal Procedure. In 1964 the decision in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), was handed down.

Thereafter, it was recommended by the said State Bar Committee that an additional paragraph without section or subsection numbers be added to the proposed Article 18.01 as follows:

"No search warrant shall issue for any purpose in this State unless a sworn complaint therefor shall first be filed with the issuing magistrate setting forth sufficient facts to satisfy the magistrate that probable cause does in fact exist for its issuance."

The recommendation or addition was made because of the holding in *Aguilar*, that sufficient facts must be presented to the magistrate to satisfy him that probable cause does in fact exist for the issuance of a search warrant. The two-prong test of *Aguilar* for determining probable cause was not, however, written into the change to proposed Article 18.01 by the said State Bar Committee.

The recommendations of the State Bar Committee as to revision of the 1925 Code of Criminal Procedure were made to the Legislature, including the one as to Article 18.01 in 1965. Thereafter, a new Code of Criminal Procedure was adopted by the Legislature. Acts 1965, 59th Leg., ch. 722, effective Jan. 1, 1966. Article 18.01, without change from the recommendations from the State Bar Committee was adopted by the Legislature as a part of the new code. While it could have, the Legislature did not write into statute the two-prong test of *Aguilar*.

In 28 Texas Bar Journal 727, 795 (1965), Onion, Commentary on the Revised Code of Criminal Procedure, this writer wrote:

"The United States Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, voided a Texas search warrant based merely upon 'reliable information,' and held that there must be sufficient facts presented to satisfy the magistrate that probable cause does in fact exist for the issuance of a search warrant.

"The new code has been reworded to meet these requirements. Therefore the affiant (usually a police officer) an affidavit for search warrant can no longer merely state he has received reliable information from a credibly person (usually unnamed) that an offense has been committed, etc. The affidavit must show the magistrate (Justice of the Peace in most cases) additional facts to for a suf-

ficient basis in fact for a determination by the magistrate that probable cause exists for the issuance of a search warrant." (Authorities cited omitted.)

An attempt was made to show the influence of *Aguilar* upon the change made in the language of old Article 304 when it became 18.01, but there was no claim made that the two-prong test had been statutorily adopted.

The Special Commentary to Article 18.01, V.A.C.C.P. (See Vol. I, p. 315, 316), was in the same language as the Bar Journal.

I have reread the Interpretative Commentary to Article 18.01 by the late Judge W.A. Morrison of this Court and that of the late Judge Fred Erisman of Longview, Chairman of the State Bar Committee. I cannot agree that they are contrary to my commentary.

I am fully aware of the results that Judges Clinton and Teague would like to reach in this cause, and I respect their views, but sadly they misinterpret my commentary upon which they seek to rely.

DUNCAN, Judge, concurring.

I concur with the majority's conclusion that neither Art. I, § 9 of the Texas Constitution or Art. 18.01, V.A.C.C.P., require that an affidavit based upon hearsay must comport with the *Aguilar–Spinelli* doctrine. Further, I find that Judge McCormick's textual analysis, in this instance, review of prior state case law, and the applicable state statute appropriate and commendable. These are the methods of review, among others, that this Court should follow in examining our Constitution. See Hans Linde, "E Pluribus—Constitutional Theory and State Courts," in *Developments in State Constitutional Law: The Williamsburg Conference*, ed. Bradley D. McGraw (St. Paul, Minn.: West Publishing Co., 1985) pp. 227–305.

However, I do object to the majority's comment that his case was decided as it was in order "to stay in step with the federal constitutional model for probable cause determinations." There is no constitutional requirement that this Court specifically adopt either the reasoning or the holding in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Consequently, there is no reason for this Court to feel compelled to "stay in step with the federal constitutional model for probable cause determinations."

The United States Supreme Court is not the infallible institution that this Court on occasion has assumed it to be. For example, a plurality of this Court in *Brown v. State*, 657 S.W.2d 797 (Tex.Cr.App.1983) stated: "[T]his court has opted to interpret our Constitution in harmony with the Supreme Court's opinions interpreting the Fourth Amendment." *Id.*, at 799. *Osban v. State*, 726 S.W.2d 107 (Tex.Cr.App.1986). I am unwilling to be so arbitrarily submissive.

Because the Supreme Court is not invested with divine guidance, there is nothing inherently improper in state court opinion diverging from Supreme Court authority on the very simple basis that there is a viable disagreement on the matter of interpretation. As Professor Robert Williams has commented: "Our system of federalism has always contemplated such disagreement." Robert F. Williams, *In the Supreme Court's Shadow: Legitimacy of State Rejection of Supreme Court Reasoning and Result*, 35 S.C.L.Rev. 353, 368 (1984).

If I had concluded that Art. I, § 9 of the Texas Constitution or Art. 18.01 V.A.C.C.P. required strict adherence to the *Aguilar–Spinelli* doctrine I would not hesitate to so state despite *Illinois v. Gates, supra.*

With these comments I concur.

MILLER and CAMPBELL, JJ., join.

CLINTON, Judge, dissenting.

"Texas is a free and independent State, subject only to the Constitution of the United States," Article I, § 1, Bill of Rights, Constitution of The State of Texas. The Tenth Amendment specifically provides that *"powers* not delegated to the United States by the Constitution, nor prohibited

by it to the States, *are reserved to the States respectively*, or to the people." [1]

Thus here today we are dealing with the very sovereignty of The State of Texas and the basic integrity of this Court as a repository and keeper of that sovereignty in criminal law matters. With Chief Justice Marshall, we must "never forget that it is a constitution we are expounding," *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819), and "as to the true scope of the Texas Constitution, we must ultimately follow our own lights," *Olson v. State*, 484 S.W.2d 756 (Tex.Cr.App.1972) (Opinion on Rehearing).

The Fourth Amendment to the Constitution of the United States "sought to guard against an abuse that more than any one single factor gave rise to American independence," *Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) (Justice Frankfurter dissenting, at 159, 67 S.Ct., at 1105). Yet, it provides no more than minimum safeguards against unreasonable searches and seizures and for warrants upon probable cause. States may not infringe on federal constitutional guarantees, but they have full power and complete authority to provide greater protection to the citizenry. *Milton v. State*, 549 S.W.2d 190, 192 (Tex.Cr.App.1977); see *Olson v. State*, supra, at 762, and authorities cited in note 2, *post*.

Elsewhere I have chronicled "the separate life of Article I, § 9." *Brown v. State*, 657 S.W.2d 797, 806 n. 27 (Tex.Cr. App.1983) (Clinton, J., concurring). Now, the majority merely reads § 9 along with the Fourth Amendment, and is content to say that because the language is "in all material respects, the same," arguments for greater protections "must be addressed on the basis of interpretive caselaw or legislative pronouncements." At 162. However, that simplistic notion would preclude consideration of enduring principles of "federalism," as well as relevant policy considerations.[2]

---

1. All emphasis is mine throughout unless otherwise noted.

2. The Constitution, the laws of the United States and all treaties made under authority of the United States are "the supreme Law of the Land; and the Judges in every State shall be bound by them, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Article VI, 2d para. Yet, that certain rights are identified in the Constitution "shall not be construed to deny or disparage others retained by the people," Ninth Amendment, and "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," Tenth Amendment. In ordaining and establishing the Constitution in the name of the People of the United States, the genius of the Framers was in maintaining sovereignty of the government of the United States of America while preserving integrity of each constituent State. See *Fry v. United States*, 421 U.S. 542, 547, n. 7, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975).

That "constitutional policy" has come to be called "federalism." In its criminal law aspect States may not abridge federal constitutional rights, guarantees and protections, but they are free to enlarge them. *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Michigan v. Mosley*, 423 U.S. 96, 120–121, 96 S.Ct. 321, 334, 46 L.Ed.2d 313 (1975) (Brennan, J., dissenting). Thus, as the President of Texas Young Lawyers Association has incisively discerned, "It takes *both* the United States Constitution and the 50 state constitu-

tions to determine the extent to which the federal system protects individual rights." Raney, *"The Federal System, Part One: A Salute to the Texas Bill of Rights,"* Vol. 50 No. 3 Texas Bar Journal (March 1987) 309 (emphasis in original).

Texan Forefathers inserted toward the end of their first constitution a "Declaration of Rights," and declared it to be "a part of this Constitution, and shall never be violated." The last Bill of Rights adopted in 1876 declared that everything therein "is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto ... shall be void." Article I, § 29.

If for no other reason than the people of The Republic of Texas and then of The State of Texas so dearly valued their rights that they insisted upon protection against intrusion by authorities of the very government they had established and were maintaining, members of the Judicial Department are constitutionally bound by their oath to "preserve, protect and defend" those rights, guarantees and protections. Article XVI, § 1.

While there are many other reasons, a few will suffice. Since citizens of Texas have more contact with state law, their own Bill of Rights should be "closely scrutinized" by their courts. *Raney*, op cit., supra, at 310. And a state constitutional claim should be considered ahead of a federal claim because, Dean W. Frank Newton points out in an unpublished paper presented to Appellate Judges Session, Texas Judicial Conference, September 25, 1986, if the issue may be

Moreover, simply to compare language indicates that the majority has lost its sense of history.

Declarations of rights or bills of rights came first in constitutions of many states— before there was a Constitution of United States of America. The "most influential" was the Virginia Declarations of Rights framed by George Mason; it became "almost the copybook for other states[.]" B. Mitchell & L.P. Mitchell, *A Biography of the Constitution of the United States* (2nd Ed.) Oxford University Press, New York: 1975, at 196–197. But on the subject of protection from governmental intrusion, the model was laid in Article XIV of the 1780 Constitution of the Commonwealth of Massachusetts where in 1761 James Otis had made such moving argument against general warrants that John Adams was inspired to declaim, "American independence was then and there born." *Harris v. United States*, supra, (Frankfurter dissenting, 331 U.S. at 157, 159, 67 S.Ct., at 1104, 1105.) [3]

Among delegates to the constitutional convention of 1787 were Eldbridge Gerry of Massachusetts and James Madison of Virginia; both were also members of the First Congress. During the course of ratification of the proposed federal Constitution there was a clamor for inclusion of declarations of individual rights and liberties. In the First Congress Madison introduced a set of resolutions mostly taken from Virginia Declarations of Rights.

However, with Gerry he drew on Article XIV of the Massachusetts Constitution to draft the one that would become the Fourth Amendment in 1791 when the Bill of Rights was formally made a part of the Constitution. *Harris v. United States*, supra, (Frankfurter dissenting, 331 U.S. at 158, 67 S.Ct. at 1105); for its legislative history, see The Constitution of the United States, U.S. Government Printing Office, Washington: 1973, at 1041–1043.[4]

In due course other states were formed from territories and admitted to the Union. Contrary to popular belief those states did not necessarily use the federal Constitution as a model for their own; rather, they turned mainly to their territorial charters or to constitutions of other states. Comment, *Individual Rights and State Constitutional Interpretations: Putting First Things First*, 37 Baylor L.Rev. 493, at 497 (Spring 1985). By 1938 the constitution of every State contained "a clause like that of the Fourth Amendment and often in its precise wording." *Harris*, supra, at 160, 67 S.Ct., at 1106.

Even then, of course, guarantees in the federal Bill of Rights were not intended to and did not protect against "state action." *Barron v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 242, 8 L.Ed. 672 (1833): "These amendments contain no expression indicating an intention to apply them to the State governments. This court cannot so apply them." *Id.*, at 250. Accord: *Spies v. Illinois*, 123 U.S. 131, 166, 8 S.Ct. 21, 24, 31

---

· disposed of on that basis there is no need to reach the federal question, unnecessary appellate review problems are avoided and, most importantly, *state sovereignty is preserved.* Moreover, Dean Newton concludes, "This 'states first' approach grants double protection to Texans, as contemplated by our two-constitution federal system."

Finally, as Oregon Supreme Court Justice Hans A. Linde has commented, emphasizing use of states' bills of rights "will lead all of us *to face closer to home some fundamental values* that the public has become accustomed to have decided for them by faraway oracles in the marble temple." Linde, *"First Things First: Rediscovering the States' Bills of Rights,"* 9 U. Baltimore L.Rev. 379 (1980), quoted approvingly by *Raney*, op cit., supra, at 310.

3. The rich history of compelling events has been retold many times: e.g., *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Harris v. United State*, supra, 331 U.S., at 157–159, 67 S.Ct., at 1104–1105.

4. Therefore, Justice Frankfurter found it entirely appropriate to "look to the construction which the early Massachusetts Court placed on the progenitor of the Fourth Amendment." *Id.*, 331 U.S., at 161, 67 S.Ct. at 1106. Early on Texas Courts did just that. See, e.g., *Dupree v. State*, 102 Tex. 455, 119 S.W. 301, 303, 306, 307 (1909), citing and discussing *Fisher v. McGirr*, 67 Mass (1 Gray) 1, and *Commonwealth v. Certain Lottery Tickets*, 59 Mass (5 Cush.) 369.

L.Ed. 80 (1887).[5] Thus over a span of one hundred years fundamental rights to privacy and protections against arbitrary intrusion by state and local government were secured only to the extent granted and provided by state constitutions. See, Comment, *op cit.*, supra, at 497, citing Newman, *The "Old Federalism": Protection of Individual Rights by State Constitutions in an Era of Federal Court Passivity*, 15 Conn.L.Rev. 21, at 22 (1983).

In 1832 early Texans, seeking separation from the State of Coahuila, convened in San Felipe de Austin and drew up a proposed constitution modeled on the Massachusetts Constitution of 1780. Comment, supra, at 497, n. 38; Interpretive Commentary following Preamble to Texas Constitution of 1876; 1 Vernon's Texas Constitution 198 (Vernon 1955) (Interpretive Commentary). Stephen F. Austin undertook a mission to Mexico City to present the proposed constitution and related petitions, and was clapped into jail.

Along with others that development produced grievances aired at other conventions in October 1834. Introduction to Constitutions of Texas, 3 Vernon's Texas Constitution (Vernon 1955) 507 (Introduction).

Increased disaffection with the national government caused representatives of municipalities to convene again at San Felipe de Austin in November 1835; they declared a state of war and created a Provisional Government for Texas. *Ibid.* See *id.*, at 509 and 511.[6]

Their grievances were more formally enumerated March 2, 1836, in the Declaration of Independence from Mexico.[7] Within two weeks they had formulated and adopted the Constitution of the Republic of Texas. 3 Vernon's Texas Constitution (Vernon 1955) 523 ff.

That Constitution mandated the Congress to introduce by statute the common law of England "with such modifications as our circumstances, in their judgment may require," and provided that "in all criminal cases the common law shall be the rule of decision." Article IV, § 13. In a schedule it was declared that "all laws now in force in Texas, and not inconsistent with this Constitution, shall remain in full force, until declared void, repealed, altered, or expire by their own limitation." Schedule, § 1.[8] The preamble to the Declaration of Rights makes the Declaration a part of the

---

**5.** Although adoption of the Fourteenth Amendment was proclaimed in 1868, not until *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925), did the Supreme Court suggest states may be bound through its Due Process Clause by rights and liberties guaranteed in the Bill of Rights. See also *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). In *Wolf v. People of the State of Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the Supreme Court held security of privacy against arbitrary intrusion by police is enforceable against the States through the Due Process Clause. The federal exclusionary rule under the Fourth Amendment was not applied to the states until *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**6.** In the latter, the Provisional Judiciary was granted jurisdiction over "all crimes and misdemeanors recognized and known to the common law of England;" judges were empowered to grant writs of arrest "established by the 'Civil Code' and 'Code of Practice' of the State of Louisiana, to be regulated in the forms thereof," Article VI, and "in criminal cases the proceedings shall be regulated and conducted upon the principles of the common law of England," Article VII.

**7.** At least three are relevant here, *viz:*

"It incarcerated in a dungeon, for a long time, one of our citizens, for no other cause but a zealous endeavor to procure the acceptance of our Constitution, and the establishment of a state government."

"It has suffered the military commandants, stationed among us, to exercise arbitrary acts of oppression and tyranny, thus trampling upon the most sacred rights of the citizen[.]"

"It has demanded the surrender of a number of our citizens, and ordered military detachments to seize and carry them into the interior for trial[.]"

Accordingly, the people of Texas constituted "a FREE, SOVEREIGN, AND INDEPENDENT REPUBLIC," "fully invested with all the rights and attributes which properly belong to independent nations[.]" Declaration of Independence, 3 Vernon's Texas Constitution (Vernon 1955) 521–522.

**8.** An Act of January 20, 1840, made the common law of England, so far as not inconsistent with the Constitution and Acts of Congress then in force, the rule of decision; it also repealed all laws in force prior to September 1, 1836—"except the laws of the Consultation and Provisional Government[.]" *Introduction,* supra, at 507.

Constitution and declares it shall "never be violated on any pretence whatever," and in order to guard against "the transgression of the high powers [delegated elsewhere]," declared that "everything in this bill of rights ... is reserved to the people."

When thus examined in "our own lights," the fact that provisions of § 9 and the Fourth Amendment "are, in material aspects, the same," proves nothing. Justice Frankfurter remarked in *Harris*, supra, 67 S.Ct. at 1104, that "one's views regarding [given circumstances in a case] ultimately depend upon one's understanding of the history and the function of the Fourth Amendment." [9] So here is needed a similar understanding of § 9; correctly comprehended, that § 9 reads like the Fourth Amendment is merely a coincidence of historical facts.

There is no indication that Framers drew on the Fourth Amendment rather than a similar declaration from a state or territory. Texans had no reason to have more than a civil interest in the Fourth Amendment: It could not provide any protection whatever to citizens of The Republic of Texas; even after Texas joined the Union, the Fourth Amendment remained a restriction alone on the federal government until long after the present Constitution of 1876 was adopted. Therefore, the issue cannot be whether the Framers were seeking "greater protection" than provided by the Fourth Amendment against arbitrary invasions of privacy by government. Rather, the question must be what protection did the Framers contemplate was independently vouchsafed by their own Constitution. *Comment*, supra, at 509.

As we have seen, early Texans resisted just such invasions, demanded in strongest terms protection against abuse of power, fought for their rights and, winning their freedom, created and established their own form of government—a free, sovereign and independent republic. From many sources they framed a constitution; then, understanding and appreciating that "transgression of the high powers" being delegated to The Republic of Texas must be prevented, the Framers particularized in the Declaration of Rights every right then deemed worthy of protection, "never [to] be violated on any pretence whatever." That is to say, not to be violated by governmental authorities of the Republic. There being no provider from any other source of protection against abridgement by officers of departments of government, they created a judicial department and charged it to enforce those rights in accordance with the common law of England, as well as all extant laws of Texas not inconsistent with the Constitution—not the Constitution of the United States.[10]

Nevertheless, disdaining its genesis because the language of § 9 and the Fourth Amendment are substantially the same, in accepting wholesale the Supreme Court's "totality of the circumstances" approach to evaluating the reliability of hearsay tendered to show probable cause under § 9, the majority proceeds on two bases. First, it reports that "a review of the procedures used by this Court in the past for determining probable cause provides little, if any guidance," in that they only "tacitly applied" the federal test to state law. At

**9.** Justice Frankfurter added that a decision may turn on "whether one gives that Amendment a place second to none in the Bill of Rights, or considers it on the whole a kind of nuisance, a serious impediment in the war against crime." *Ibid.*

**10.** The people of Texas never voluntarily relinquished the right to claim protections granted by the original Fifth Declaration. The Constitution of 1845 was drawn on a new constitution of Louisiana and the proposed constitution of 1833, but the general plan of government and the bill of rights seem to be patterned on the Constitution of the Republic. *Interpretive Commentary*, supra, at 199. Then came the "late

unpleasantness" and Reconstruction, during which government was equally hostile and oppressive. To guard against continuation or repetition of those evils, delegates met again to form another constitution. Using the former 1845 constitution "as a working model," drafters of the present Constitution included ideas taken from, e.g., constitutions of Louisiana and Pennsylvania. *Id.*, at 201; Comment, *supra*, at 497, n. 38 and accompanying text. Through it all substance of the Fifth Declaration remained intact as a statement of right to security against unreasonable searches and seizures, as well as prohibitions against state and local government.

162. Second, resorting to "legislative pronouncements," it finds essentially that legislative action taken after *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), does not mean what Judges W.A. Morrison and John F. Onion, Jr., wrote in their respective commentaries, because they did not specify "the two prongs of *Aguilar*" or otherwise indicate that such analysis was "intended to be incorporated within the statute." At 163. Hypercritical to an extreme, neither of these arguments is particularly persuasive.

There is guidance aplenty as to past "procedures" used first by the Supreme Court of Texas and this Court to determine nearly all aspects of the law, including probable cause, demonstrated in my concurring opinion in *Brown v. State*, supra, at 800–801: "if not delineated by their own precedents, out of necessity young Texas courts looked to the common law or took the law from any other respectable source." Just in that fashion did the Supreme Court of Texas introduce into state law a definition of probable cause. *Ibid.* See note 4, *ante.*

Certainly the scope of the Fourth Amendment and of Art. I, § 9,—indeed, all state versions of the same—are similar, inasmuch as both would safeguard the security of the people against evidentiary searches absent "probable cause." That all constitutional provisions require "probable cause," however, does not facially mandate particular guidelines for implementation. This Court was free to, and in fact did, formulate its own working definition of "probable cause" to be applied in context of Art. I, § 9, in order to determine whether evidence must be excluded under now Art. 38.23, V.A.C.C.P., as having been "obtained ... in violation of any provisions of the Constitution ... of the State of Texas," as opposed to the federal constitution. See *Brown v. State*, supra at 806. We are

equally free now, if not duty bound, to fashion according to "our own lights" a standard under Art. I, § 9, by which to determine when information that is hearsay as to a search warrant affiant will be deemed sufficiently reliable to support a finding of "probable cause." Unless we happen to agree that the standard adopted by the Supreme Court is the most efficacious also in guaranteeing rights vouchsafed by our state constitution, the Supreme Court does not demand and we need not parrot its opinions.

In *Aguillar v. State*, 172 Tex.Cr.R. 629, 362 S.W.2d 111 (1962), defendant challenged admission of fruits of a seizure pursuant to a search warrant, contending that the affidavit was not "a sufficient statement of probable cause to comply with the Constitution of the United States and of this State," *Id.*, 362 S.W.2d at 113. Writing for the Court on rehearing Judge Morrison expressed the notion "that if we have properly decided this case under our Constitution and statutes then it has been properly decided under the Constitution of the United States and the holding in *Mapp v. Ohio*, supra." *Ibid.* Of a form commonly used before 1965, the affidavit recited:

> that affiants "have reason to believe and do believe [that named party possesses narcotic drugs for purpose of unlawful sale in that on or about a given date];
> .... Affiants have received reliable information from a credible person and do believe [that narcotics are there so possessed]." *Ibid.*

Because the Court had "often held" such an affidavit "constitutes a sufficient recitation of 'probable cause'" [citing only *Davis v. State*, 165 Tex.Cr.R. 2, 302 S.W.2d 419 (1957)], the Court was unable to conclude that "our exclusionary statute and the affidavit deprive an accused of due process under the Federal Constitution." *Id.*, 362 S.W.2d at 114–115.[11]

---

11. *Davis v. State*, supra, does not indicate whether it held the affidavit sufficient under Fourth Amendment or § 9, but cites an important decision by the Court—*Chapin v. State*, 107 Tex.Cr.R. 477, 296 S.W. 1095 (1927), which shows again the "methodology" utilized by the Court early on. See *Brown v. State, supra*, at

801, 806. It also involved the search of a private dwelling, this time under a particular statute requiring that affidavits of two persons "*show* that such residence is a place where intoxicating liquor is sold [et cetera]." The affidavits recited only that "affiants have reason to believe, and do believe, [et cetera]." The con-

In *Aguilar v. Texas,* supra, straight from *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the Supreme Court formulated its "two prong test," reversed the judgment of the Court and remanded the cause. On remand the

tention was that fruits of a search were obtained in violation of both Article I, § 9, and the Fourth Amendment in that warrant was issued "without probable cause, supported by oath or affirmation." *Id.,* 296 S.W. at 1096–1097.

Writing the lead opinion, Presiding Judge Morrow pointed out that to authorize search of a private dwelling for contraband a warrant must be issued in accord with probable cause requirement of Article I, § 9, and noted that "[b]efore our Constitution [of 1876] was adopted," the Supreme Court of Texas had defined probable cause in *Landa v. Obert,* 45 Tex. 539 (1875). See *Brown v. State,* supra, at 801. Reviewing works of learned scholars and decisions of state and federal courts, including the Supreme Court of the United States, Presiding Judge Morrow found many precedents declaring invalid a search warrant issued upon an affidavit that "affiants had reason to believe and did believe," and that the great weight of authority is "that the grounds for belief, that is, the facts and circumstances or information upon which the belief is founded, must be exhibited in the affidavit." *Id.,* 296 S.W. at 1097. The question of validity of the warrant and supporting affidavits "must be determined by the construction of [the statute], in connection with article 1, § 9, Bill of Rights, and the previous interpretation of the term 'probable cause' as used in the Bill of Rights." *Id.,* at 1098–1099.

First he found that the terms of the statute indicated "a *legislative* intent to adhere to the interpretation of the constitutional requirement of 'probable cause' that the affidavit state the facts and circumstances upon which the belief is founded," because it required the affidavit to "show" that the residence was a place where the law was violated, and "show" means "to make clear or apparent; to prove. [citations omitted]." *Id.,* at 1099.

Turning then to the Texas exclusionary rule in former article 727a (now Article 38.23, V.A.C.C. P.), Presiding Judge Morrow, having examined other authorities from like sources, pointed out:

"Belief on undisclosed information does not show 'probable cause' for search, as that term is used in the state and federal constitutions. Such is the expressed view of the United States courts and of nearly all the state courts.... The definition of 'probable cause' announced by the Supreme Court of this state before the present Constitution was adopted is like that in the federal courts, and, the state courts holding the belief insufficient, and in adopting the Constitution, the definition was approved."

*Id.,* at 1099.

Comparing the statute involved in an earlier decision of the Supreme Court in *Dupree v. State,* 102 Tex. 455, 119 S.W. 301 (1909), Presiding Judge Morrow believed the Legislature did not intend to give a meaning to the term probable cause different from that "prevailing in the Supreme Court of the United States, announced in the statutes of the United States, and adopted by practically all of the states of the Union," and did not intend to provide that a warrant to search a private dwelling might issue upon an affidavit giving "no fact, circumstance, or detailed information showing, or tending to show, that the dwelling was used for the purpose denounced by the statutes which conveyed to the magistrate ... no information from which to determine whether the facts justified issuance of the warrant." *Id.,* at 1100.

Accordingly, he concluded:

"If the affiants seeking a search warrant have reason to believe that a private dwelling is used for the storage of liquor, no sound reason is perceived for failing to disclose the grounds of belief in the affidavit presented to the magistrate.... The rule is intended to 'give a guaranty to the citizen against searches and seizures dependent upon such uncertainties by interposing between him and the rash or unscrupulous accusers the judgment of a magistrate chosen by the state.'"

"Because the criminating evidence was obtained through a search upon a warrant without legal authority, it was improperly received over the objections of the appellant." Judgment was reversed and the cause remanded. *Ibid.*

Judge Hawkins concurred with an opinion in much the same vein. At one point he reasoned that an affidavit which simply states affiant "believes and has good reason to believe" that probable cause exists "seeks to substitute the opinion of the affaint for the judgment of the magistrate who in such case is called upon to act judicially without any knowledge of the facts upon which the affiant predicated his belief." *Id.,* at 1101. He discovered "nothing in our present statutes which indicates any purpose of the Legislature to attempt a departure from the well-established holding of the United States Courts and those of a majority of the other states to the effect that an affidavit for a search warrant which furnishes no facts or information to the issuing magistrate ... does not comply with the provisions of our own and the federal Constitution requiring 'probable cause' to be shown." *Id.,* at 1102.

Judge Lattimore dissented, expressing his adherence to language of statutes then extant, and refusal "to follow federal courts in their procedure or rulings." *Id.,* at 1102–1108.

The opinions of the Court in *Chapin,* supra, note 12, preceded by thirty years the opinion of the Supreme Court of the United States in *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), and its holding that mere conclusions in an affidavit are not sufficient.

Court summarily reversed the judgment of conviction. *Aguillar v. State*, 382 S.W.2d 480 (Tex.Cr.App.1964).[12]

The *Aguilar* experience taught Texas two major lessons: one, that what statutory provisions there were for authorizing issuance of an arrest or search warrant did not meet constitutional muster;[13] two, that views recently prevailing on the Court in expounding sufficiency of an affidavit to show "probable cause" within the meaning of Article I, § 9, failed to produce even minimal federal protection. They will be discussed seriatim.

Before *Aguilar* the general statute dealing with a search warrant was former article 304 (C.C.P.1925); it is merely a definition, having little to do with sufficiency of an affidavit.[14] See Historical Note to Article 18.01, the first paragraph of which is former article 304. It was retained in the 1965 revision, but in light of *Aguilar* the Legislature added the second paragraph: "No search warrant shall issue for any purpose in this State unless a sworn complaint therefor shall first be filed with the issuing magistrate setting forth sufficient facts to satisfy the magistrate that probable cause does in fact exist for its issuance." It too was revised in 1973.

Both commentaries to Article 18.01, supra, make clear the addition was made by the Legislature on account of recent decisions by the Supreme Court, and each states the new provision is to meet their requirements; Presiding Judge Onion points out that *Aguilar* "voided a Texas search warrant based merely on 'reliable information,' and held there must be sufficient facts presented to satisfy the magistrate that probable cause does in fact exist for issuance of a search warrant;" he then states what is insufficient and again what the affidavit must show, identifying the other cases.

The majority blinks reality in dismissing those contemporaneous commentaries concerning new statutory dictates of Article 18.01(b), on the specious ground that they do not "mention the two prongs of *Aguilar* or make any statement to the effect that such analysis is intended to be incorporated in the statute." At 163. Surely the majority would not contend with a straight face that § (b) was added to Article 18.01 for any other reason. The Special Committee for Revision of the Code of Criminal Procedure expressly identified consideration of *Aguilar v. Texas* among several recent decisions of the Supreme Court "which have adversely affected the long accepted practices in our Texas courts." Erisman, *Introduction to 1965 Revision Texas Code of Criminal Procedure*, 1 Vernon's

---

**12.** The holding of *Giordenello* that mere conclusions are insufficient presaged all contemporaneous decisions in similar search warrant litigation, *viz: Etchieson v. State*, 372 S.W.2d 690 (Tex.Cr.App.1963), judgment vacated and cause remanded, 378 U.S. 589, 84 S.Ct. 1932, 12 L.Ed. 2d 1041 (1964), on remand, 382 S.W.2d 478 (Tex.Cr.App.1964); see also arrest warrant litigation in *Barnes v. State*, 390 S.W.2d 266 (Tex. Cr.App.1964), reversed and remanded, *Barnes v. Texas*, 380 U.S. 253, 85 S.Ct. 942, 13 L.Ed.2d 818 (1965), on remand, 390 S.W.2d 270 (Tex.Cr.App. 1965).

**13.** Prior to 1965, the statutory provision for a "complaint" sufficient to authorize a magistrate to issue an arrest warrant was article 222, now Article 15.05, V.A.C.C.P. That both are constitutionally inadequate to the task is demonstrated by *Barnes v. Texas*, 380 U.S. 253, 85 S.Ct. 942, 13 L.Ed.2d 818 (1965), summarily reversing judgment in *Barnes v. State*, 390 S.W.2d 266 (Tex.Cr. App.1964), in light of *Giordenello v. United States*, supra, and *Aguilar v. Texas*, supra. Presumably the reversal came too late to raise

prescriptions in Article 15.05, supra, to minimal federal constitutional requirements, but both the late Judge Morrison in his Interpretative Commentary and Presiding Judge Onion in his Special Commentary following article 15.05 indicate that the *Barnes* opinion of the Supreme Court supersedes the statute.

**14.** The 1925 code of criminal procedure, as in all codes since the Old Code, provided authority to issue search warrants for limited specific purposes, e.g., "property acquired by theft" etc. See former article 305, reproduced in Historical Note following Article 18.02, V.A.C.C.P. Concomitantly, statutory requisites for a "written sworn complaint" before a magistrate were likewise related to the particular purpose. See former articles 310, 311 and 312, C.C.P. 1925, carried forward substantially into the 1965 C.C.P. See Historical Notes to Articles 18.07, 18.08 and 18.09, respectively. They were all deleted by substitution of conforming amendments to the Penal Code, by Acts 1973, 63rd Leg., ch. 399, p. 982, § 2(E), leaving only Article 18.01(b) to prescribe requisites.

Annotated Code of Criminal Procedure (Vernon 1977) xv, at xix-xx.[15] To understand its "two-pronged test," all any concerned reader has to do is consult *Aguilar.*[16]

Acknowledging, as it must, that to challenges under § 9 the Court "tacitly" applied "the Aguilar–Spinelli test,"[17] the majority nevertheless does not find "judicial preference" for a broader interpretation of § 9 than the Fourth Amendment. But it is not a matter of "preference." When "tacitly" or otherwise the Court put § 9 to "the Aguilar–Spinelli test" it certainly was incorporating into the meaning of probable cause in § 9 those requirements imposed by *Aguilar-Spinelli,* thus making them a part of the constitutional law of search and seizure for this State. That the Supreme Court of the United States modified its own views as to a requisite showing of probable cause within the meaning of the Fourth Amendment will not serve to withdraw a meaning of probable cause attributed by this Court to Article I, § 9 of the Constitution of Texas.

Opinions of a majority of the Court in *Chapin v. State,* supra, and its followings, required "that the grounds of belief, that is the facts or circumstances or information upon the belief is founded, must be exhibited in the affidavit," *id.,* 296 S.W. at 1097, and that is readily susceptible to an *Aguilar* analysis. But apparently because our

general statutes setting out requisites of a complaint or application for search warrant were not that specific, articles 310–312, C.C.P. (1925), the Court came to believe, as in *Aguilar v. Texas,* supra, a statement merely that an affiant "received reliable information from a credible person" sufficed. *Id.,* 378 U.S. at 113, 84 S.Ct. at 1513; *Davis v. State,* supra, 302 S.W.2d at 420. In the event, it is certainly true that before *Aguilar v. Texas,* supra, neither Article I, § 9 nor the statutes of the State had been construed by the Court to require a showing of probable cause such as particularized in *Aguilar.* But once *Aguilar* was made applicable to § 9 by this Court and caused the addition of § (b) to Article 18.01 by the Legislature, under our federalism the fact that a reconstituted Supreme Court changed a part of its collective mind as to *minimal* protections afforded countrywide by the Fourth Amendment will not *ipso facto* overrule decisions of this Court and repeal an enactment of our Legislature. That the Supreme Court "no longer demands it" is utterly irrelevant. The Supreme Court may not demand a State undo that which the State has already validly done in exercise of its own constitutional power. The Tenth Amendment reserves that power to the State of Texas—to this Court and to the Legislature, respectively.[18]

---

**15.** After citing the *Aguilar* litigation, Judge Erisman wrote:

> "The filing *of sufficient facts to satisfy the Magistrate that probable cause* does in fact exist for the issuance of a search warrant, is a requirement of *Articles 18.01, 18.08, and 18.09, supplementing CCP 304, 311, 312.*"

(Emphasis supplied by Judge Erisman.)

**16.** Almost twenty years after *Aguilar* was decided and § (b) had been added to Article 18.01, *Illinois v. Gates* was issued, and a Court Panel composed of two judges delivered an opinion in *Hennessy v. State,* 660 S.W.2d 87 (Tex.Cr.App. 1983). The majority says *Hennessy* presented an "opportunity to interpret Article 18.01(b), supra, in light of *Aguilar.*" However, except for indicating Article 18.01(b) was cited to support her contention, the two judge opinion never again so much as alluded to it. In short, they failed to seize the opportunity. To find now "the reasoning of *Hennessy* sound" *vis a vis* the statute when there is none is to make the wish

father to the thought. Moreover, to apply "*Gates'* standards and principles" retroactively twenty years to a *state* statute defies every reasonable canon of statutory construction.

**17.** *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969): Affidavit must not only state conclusion of affiant and informer but also include facts from which magistrate can find conclusions are warranted; facts must allow magistrate to conclude his information is reliable and informer is credible.

**18.** Recently, among other states, Massachusetts illuminatingly proved the point in the *Upton* case. *Commonwealth v. Upton,* 390 Mass. 562, 458 N.E.2d 717 (1983); *reversed and remanded, Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1985); *on remand, Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985).

Notwithstanding *Illinois v. Gates,* the Supreme Judicial Court of Massachusetts continued to

Unless otherwise prohibited, this Court is, of course, always "free to follow the lead" of the Supreme Court, but not mindlessly, wildly abandoning years of jurisprudence and statutory law of this State, as the majority would have this Court do today.

The majority does not even take time to consider the soundness of *Illinois v. Gates,* nor did the *Hennessy* panel. Instead, the majority silently defers to much of the rhetoric in *Gates.* Yet bases for rejecting the two-prong test, both in precedent and in logic, have been thoroughly undermined by state court justices and noted commentators on Fourth Amendment jurisprudence. E.g., *Commonwealth v. Upton,* supra; *State v. Jackson,* 102 Wash.2d 432, 688 P.2d 136, 141–43 (1984); LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 3.3(a) at 620–25; (2nd ed. 1987) Y. Kamisar, *Gates, "Probable Cause," "Good Faith," and Beyond,* 69 Iowa Law Review 551, 571–77, 583–84 (1984).

The question here, as in *Gates,* is whether hearsay information may be credited. Once that information is deemed creditable, *then* we should apply "a common sense, non-technical analysis" to decide whether it adds up to probable cause. As Justice Brennan observed in his dissenting opinion:

"Neither the [*Aguilar/Spinelli*] standards nor their effects are inconsistent with a 'practical, nontechnical' conception

of probable cause. Once a magistrate has determined that he has information before him that he can reasonably say has been obtained in a reliable way by a creditable person, he has ample room to use his common sense and to apply a practical, nontechnical conception of probable cause."

462 U.S. at 287, 103 S.Ct. at 2358, 76 L.Ed.2d at 580. In short, the "two-prong" test derived from *Aguilar* and *Spinelli* was never an impediment to practical, common sense evaluation of information for its tendency to establish probable cause. Rather, it was a guide to the threshold inquiry of whether information that is hearsay as to the warrant affiant should be considered sufficiently reliable in the first place even to be measured for its probable cause value.

Because the majority in *Gates* failed to recognize this distinction, it was able to conclude that the two prongs of the *Aguilar/Spinelli* test "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations[.]" 462 U.S. at 233, 103 S.Ct. at 2329, 76 L.Ed.2d at 545. Accordingly it was concluded that a deficiency in the "basis of knowledge" prong might be compensated for by an ample showing of "veracity," and vice versa. However, as Professor LaFave has pointed out, even:

rely on *Aguilar–Spinelli* in applying the probable cause requirement of the Fourth Amendment. The Supreme Court of the United States said the Supreme Judicial Court "misunderstood our decision in *Gates,*" and thereby fell into error. *Massachusetts v. Upton,* supra, 466 U.S. at 732, 104 S.Ct. at 2087–2088. In his separate concurring opinion, Justice Stevens took the Supreme Judicial Court to task.

"In my opinion the Supreme Judicial Court of Massachusetts reflects an error of a more fundamental character than the one this Court corrects today. It rested its decision on the Fourth Amendment without telling us whether the warrant was valid as a matter of Massachusetts law. [Notes omitted throughout]. It has thereby increased its burdens as well as ours. For when the case returns to that court, it must then review the probable-cause issue once again and decide whether or not a violation of the state constitutional protection against unreasonable searches and sei-

zures has occurred. If such a violation did take place, much of that court's first opinion and all of this Court's opinion are for naught." *Id.,* at 735, 104 S.Ct. at 2089.

On remand the Supreme Judicial Court heeded that admonition, and in effect rendered its first opinion and that of the Supreme Court "for naught." For its own reasons and others given by commentators and courts, it rejected "totality circumstance test" as a standard for determining probable cause under Article XIV of its own Declaration of Rights. *Commonwealth v. Upton,* supra, 476 N.E.2d at 556, and n. 10. Instead, it adopted "stricter" *Aguilar–Spinelli* tests as the state standard for several reasons including that it provides more substantive protection than does the Fourth Amendment according to *Gates. Id.,* at 556–558.

In *Commonwealth v. Bottari,* 395 Mass. 777, 482 N.E.2d 321, (1985) the Supreme Judicial Court applied *Aguilar–Spinelli* to a warrantless arrest. *Id.,* 482 N.E.2d at 325.

"[t]he preferred method of satisfying the basis of knowledge requirement, a direct statement from the informant himself as to how he came by the information, is virtually worthless when it comes from an individual from the criminal milieu about whom no veracity judgment is possible. And information tendered by a person of unquestioned credibility is worth very little when no judgment is possible as to the basis of his conclusions —whether or not, to use the Court's oft-quoted language, he is merely reporting 'an offhand remark heard at a neighborhood bar.'"

LaFave, supra at 622–23. In fact, as Justice White pointed out in his concurring opinion in *Gates*, information even from a proven informant which provides little or no indication of the source of his knowledge would be tantamount to a conclusory affidavit from a peace officer simply stating "that he has cause to suspect and does believe" his information to be true—patently insufficient data, under *Nathanson v. United States*, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933), to support a magistrate's independent conclusion that probable cause inheres. See also *Stanley v. State*, 19 Md. App. 507, 313 A.2d 847, 861 (1974). Yet the majority in *Gates* ratified the holding of *Nathanson.*

I would adhere to the "two-pronged test" of *Aguilar–Spinelli* for purposes of Art. I, § 9 of our Constitution because of its utility in guiding all concerned to a complete assessment of informant creditability. Such a guide is useful both to the police, who must prepare affidavits on the basis of hearsay, and to magistrates who must evaluate them in order independently to determine whether the hearsay declarant's story is trustworthy. Trustworthiness is a function, not only of the honesty or reliability of the informant, but of the source in fact for his information. I agree with the observation that "[p]olice, magistrates, and trial courts confront the question of probable cause every hour of every day, often with little time to reflect. They are best served by rules that mark off the forbidden territory as conspicuously as possible." Wald, *The Unreasonable Reasonableness Test for Fourth Amendment Searches*, 4 Crim.J.Ethics 2, 88 (Spring 1985). The *Aguilar-Spinelli* test is just such a rule.

The Legislature incorporated *Aguilar* into its search and seizure law in 1965. The Court has followed *Aguilar–Spinelli* for more than twenty years. The test is consistent with early decisions of the Court and intent of Framers of the Fifth Declaration. We preserve the sovereignity of this State and maintain the integrity of this Court by adhering to precedent that has served well our criminal justice system.

The notion that this Court must "stay in step" with the Supreme Court of the United States is the antithesis of our sworn duty to preserve, protect and defend the Constitution and laws of the State of Texas. To such a gratuitous abdication of authority and responsibility of this Court, I dissent.

TEAGUE, Judge, dissenting.

I join the dissenting opinion filed by Judge Clinton in this cause. However, given what the majority opinion that is authored by Judge McCormick states and holds, I am strongly compelled to also file this dissenting opinion.

I find that Hon. Alfred Walker, First Assistant State's Attorney, in the petition for discretionary review that he has filed in this cause on behalf of the State, has succinctly, and perhaps correctly, formulated the issue that is before this Court for resolution when he states: "The basic question in this case is whether [, given what the Legislature of Texas enacted after the Supreme Court of the United States decided *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), which, for Federal Fourth Amendment Constitutional purposes, adopted a two prong test in making the determination whether an affidavit for a search warrant should issue], the rules and principles of *Illinois v. Gates*, [462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), which abandoned the two prong Aguilar test], should be followed *in Texas* in preference to the older rule and principles of *Aguilar* and *Spinelli* [*v. U.S.*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637

(1969)]." (Page 3, State's Petition for Discretionary Review.) Given the fact that what the Supreme Court stated and held in *Illinois v. Gates,* supra, in lessening the State's burden in search warrant cases, if adopted, will make it extremely easy for the State to now obtain a search warrant, or to make a warrantless arrest, it is understandable why Walker advocates that this Court should adhere to what the Supreme Court stated and held in *Illinois v. Gates,* supra.

1. The kind of struggle, that was caused by the Supreme Court decision of *Illinois v. Gates,* supra, that exists within this Court today, is not limited to just this Court. It is a struggle that exists among the appellate courts of our Nation, from the Atlantic to the Pacific. Recently, Latzer, an Associate Professor of Government at John Jay College of Criminal Justice, in his article entitled "Limits of the New Federalism" that appeared in the January, 1987 issue of *Search and Seizure Law Report,* made a study of, among other things, which States had accepted and which States had rejected the Supreme Court's decision of *Illinois v. Gates,* supra. Latzer's research reflects that those States of the Union whose high courts have maintained their judicial independence are the following: Alaska: *State v. Jones,* 706 P.2d 317 (Alas.1985); Connecticut: *State v. Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985); Massachusetts: *Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985); New York: *People v. Johnson,* 497 N.Y. S.2d 618, 488 N.E.2d 439 (1985); and Washington: *State v. Jackson,* 102 Wash.2d 432, 688 P.2d 136 (1984). At least sixteen high State courts have, unfortunately, opted, much like the aggressive and assertive majority of this Court opts, to also become nothing more than mimics or court jesters for the Supreme Court of the United States. They are the following: Arizona: *State v. Bolt,* 142 Ariz. 260, 689 P.2d 519 (1984); Colorado: *People v. Pannebaker,* 714 P.2d 904 (Colo.1986); Idaho: *State v. Lang,* 672 P.2d 561 (Idaho 1983); Illinois: *People v. Tisler,* 103 Ill. 2d 226, 82 Ill.Dec. 613, 469 N.E.2d 147 (1984); Iowa: *State v. Bousman,* 387 N.W.2d 605 (Iowa 1986); Kansas: *State v. Walter,* 234 Kan. 78, 670 P.2d 1354 (1983); Maryland: *Potts v. State,* 300 Md. 567, 479 A.2d 1335 (1984), and *Malcolm v. Maryland,* 70 Md.App. 426, 521 A.2d 796 (1987); Michigan: *People v. Chapman,* 425 Mich. 245, 387 N.W.2d 835 (1986); Mississippi: *Lee v. State,* 435 So.2d 674 (Miss.1983); New Hampshire: *New Hampshire v. Bradberry,* 129 N.H. 68, 522 A.2d 1380 (1986); North Carolina: *State v. Arrington,* 311 N.C. 633, 319 S.E.2d 254 (1984); Pennsylvania: *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1985); West Virginia: *State v. Adkins,* 346 S.E.2d 762 (W.Va.1986); Wisconsin: *State v. Boggess,* 115 Wis.2d 443, 340 N.W.2d 516 (1983); and Wyoming: *Bonsness v.*

The real issue, however, that is before this Court is whether this Court should exist merely to mimic and parrot the decisions of the Supreme Court of the United States Supreme Court, or should exist as an independent member of the Judicial Branch of our State Government. To appreciate the present internal struggle that presently exists, over what standard should be adopted,[1] it is first necessary for the reader to go and read what was stated and held by this Court in its opinion of *Aguil-*

*State,* 672 P.2d 1291 (Wyo.1983).

With the score only 16–5 at this time, with at least 29 States at this time not having gone on record, it is apparent to me that if we are counting the number of States that have accepted *Gates,* supra, against the number of States that have rejected *Gates,* we are a long way off from hearing the "Fat Lady" sing in this area of the law.

It appears to me that, regardless of what the count may now be, or what it might ultimately be, if this Court is going to adhere to the doctrine of stare decisis, which in recent times is highly questionable for reasons I pointed out in the dissenting opinion that I filed in *Brown v. State,* 657 S.W.2d 797 (Tex.Cr.App.1983), it should at least continue to subscribe to what this Court has stated and held in, for example, the following cases:

*Ruiz v. State,* 457 S.W.2d 894 (Tex.Cr.App. 1970), opinion by Judge Douglas, (Held, "In the present case, if the affidavit is construed to show that the information was furnished by Hewett by an informant (footnote omitted), then the following statement by the Supreme Court of the United States is applicable: 'Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, ... the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, ...' *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723. See *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637." (895); *Powers v. State,* 456 S.W.2d 97 (Tex.Cr.App.1970) opinion apparently by Judge Douglas, held, "The recitations in the affidavit that the affiant had been informed by reliable, credible and trustworthy citizens that appellants possessed marihuana are not sufficient. There are no underlying circumstances shown in the affidavit in the present case to inform the magistrate 'from which the informant concluded that the narcotics were where he claimed they were,' as required by the Supreme Court in Aguilar. For this reason, the marihuana seized by virtue of the search warrant based upon the affidavit should not have been admitted into evidence." (98); *Heredia v. State,* 468 S.W.2d 833 (Tex.Cr.App.1971), opin-

lar v. State, 172 Tex.Cr.R. 629, 362 S.W.2d 111 (1962); go and read what the Supreme Court of the United States thereafter stated and held in its decision of *Aguilar v. Texas*, supra, which was a review of this Court's decision of *Aguillar v. State*, supra; go and read what the Legislature of this State enacted after *Aguilar v. Texas*, supra, became the federal law of the land; and go and read what some of the spokespersons of this State in the field of criminal law, such as now Presiding Judge Onion, former Presiding Judge Morrison, former District Judge Erisman, and a host of other

ion authored by Judge Odom, held, "We note the recitations in the said affidavit that information 'from a reliable and credible informer who has furnished truthful and reliable information in the past' and 'This informer further stated he had actually been inside this room' and had purchased heroin. Thus, the two pronged test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, has been met. (834). So, in order for the affidavit to show adequate probable cause it must set forth underlying circumstances necessary to enable the magistrate independently to judge the validity of the affidant's belief that heroin was being used and sold in motel room number 17 at the Frontier Motel. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637; *Aguilar v. Texas*, supra." (835). *Nicol v. State*, 470 S.W.2d 893 (Tex.Cr.App.1971), opinion authored by Judge Odom, in which "Appellant attacks the sufficiency of the search warrant on the ground that the affidavit does not reflect adequate probable cause and sufficient 'underlying circumstances' to satisfy the requirements of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723." Held, "In determining the sufficiency of the aforementioned affidavit, we are bound by the four corners of that document." (894). After examining the affidavit, this Court also held: "The information reflects no probable cause. It is conclusionary and unsupported by sufficient facts to satisfy the test of Aguilar, supra." (894). "The test in *Aguilar*, supra, requires more. It requires that if the informer came by his information indirectly, the affidavit should explain why his sources were reliance. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. (895). The affidavit in the instant case supplies neither sufficient information as to the reliability of the informer's source nor sufficient description of the appellant's activities to satisfy these requirements. We conclude the affidavit to be insufficient. *Spinelli v. United States*, supra; *Aguilar v. Texas*, supra." For other cases in which very similar, if not identical statements can be found therein, see *Kemp v. State*, 464 S.W.2d 141 (Tex.Cr.App.); *Polanco v. State*, 475 S.W.2d 763 (Tex.Cr.App.1971); *Stoddard v. State*, 475 S.W.2d 744 (Tex.Cr.App.1972); *Lowery v. State*, 499 S.W.2d 160 (Tex.Cr.App.1973); *Ashmore v. State*, 507 S.W.2d 221 (Tex.Cr.App. 1974); *Abercrombie and Dean v. State*, 528 S.W. 2d 578 (Tex.Cr.App.1974); *Bridger v. State*, 503 S.W.2d 801 (Tex.Cr.App.1974); *Caldarera and Walker v. State*, 504 S.W.2d 914 (Tex.Cr.App. 1974); *Avery v. State*, 545 S.W.2d 803 (Tex.Cr. App.1977); *Poindexter v. State*, 545 S.W.2d 798 (Tex.Cr.App.1977); *Kleasen v. State*, 560 S.W.2d 938 (Tex.Cr.App.1977); *Gonzales v. State*, 577 S.W.2d 226, (Tex.Cr.App.1979); *Tolentino v. State*, 638 S.W.2d 499 (Tex.Cr.App.1982); *Peltier v. State*, 626 S.W.2d 30 (Tex.Cr.App.1981); and *Schmidt v. State*, 659 S.W.2d 420 (Tex.Cr.App. 1983). It was in 1983, in *Illinois v. Gates*, supra, that the Supreme Court, for Fourth Amendment purposes, abandoned the "Aguilar–Spinelli two pronged test" in favor of a "totality of the circumstances" approach, under which nebulous and amorphous standard the issuing magistrate is now to make only a "practical, common-sense decision whether there is a fair probability" that the evidence sought will be found in the place to be searched. Thus, "[t]he task of the issuing magistrate [now] is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the '"veracity"' and '"basis of knowledge"' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, supra, 103 S.Ct. at 2332. I made my cut-off with the last case that I find that this Court decided before *Illinois v. Gates*, supra, was decided. Given what the above decisions of this Court have stated, I find it rather alarming for Judge McCormick to make the following statements: "Moreover, research indicates that this Court has never stepped forward to adopt affirmatively the two-pronged Aguila–Spinelli test as THE method of assessing probable cause under the constitution and laws of the State of Texas. Finding valid precedent lacking, it is up to this Court to make a pronouncement as to the proper State model for assessing probable cause." (Page 161.) To characterize the above decisions as "unsupported by authority and to be considered dicta" is, at a minimum, not only to carelessly, but to erroneously, belittle the authors of those opinions who in writing those opinions had no choice about the matter in that they were required by the provisions of Article III of the Federal Constitution to accept and apply, notwithstanding whatever their personal views might have been on the subject, the Supreme Court's decisions of *Aguilar*, supra, and *Spinelli*, supra. It is true, of course, that had the author had a choice, he might have rejected that test. The point is that none of them had any choice about the matter because of the provisions of Article III of the Federal Constitution. Today, however, this Court has a choice to be the leader of an independent judiciary of this State, or to simply become a mimic or court jester for the Supreme Court of the United States.

spokespersons, some still alive, thereafter wrote about what the Supreme Court had held in *Aguilar v. Texas,* supra, and *Spinelli v. United States,* supra. I find that only then can one appreciate and understand why I am so concerned about what and why the majority adopts to be the law of this State on this subject.

Given what this Court has unequivocally and unambiguously stated for over the past 20 years, in subscribing to the two pronged "Aguilar–Spinelli" test, before that test is replaced by an experimental amorphous test, the majority opinion by Judge McCormick should at least direct our attention to articles written by leading spokespersons of the criminal law of this State which give justifiable reasons why the two pronged "Aguilar–Spinelli" test, which has now been time tested, which members of the law enforcement establishment have certainly more than adequately learned to cope with, to the point where some police agencies have in the past prepared and used pre-printed "fill-in-the-blank" type forms, see *Brown v. State,* 437 S.W.2d 828 (Tex.Cr.App.1968), should no longer be "the test", and not just inform the reader what *he and those members of this Court who join his opinion might personally prefer.*

In *Aguillar v. State,* supra, the defendant in that cause objected in the trial court to the admission of evidence that was obtained pursuant to the execution of a search warrant, on the ground that the affidavit for the search warrant was "based on hearsay, did not set forth a statement of the offense in clear, plain and intelligible language, and was insufficient to authorize the issuance of the search warrant." (362 S.W.2d at 112). His objection was overruled. In an opinion by one of its then Commissioners, which opinion was approved by the Court, the trial court's decision was affirmed, the opinion holding the following: "An examination of the affidavit [which merely stated the basis for obtaining the search warrant was the following: 'that on or about the 8 day of January, A.D. 1960, Affiants have received reliable information from a credible person and do believe that heroin, marijuana, bar-

biturates and other narcotics and narcotic paraphernalia are being kept at the above described premises of the purpose of sale and use contrary to the provisions of the law'] shows that it recites sufficient facts and information to constitute probable cause for the issuance of the warrant." (at 112). On rehearing, in an opinion by Judge Morrison, this Court stated that the defendant questioned the soundness of the original opinion. The opinion on rehearing stated that the defendant had contended on appeal that the affidavit for the search warrant, as a matter of both Federal and State Constitutional law, was deficient because it did not set out a sufficient statement of probable cause. This Court rejected that contention, holding that in the past this Court "has often held that an affidavit identical to the one above constitutes a sufficient recitation of 'probable cause.' *Davis v. State,* 165 Tex.Cr.R. 2, 302 S.W.2d 419 (1957)." It further stated: "We are aware of no decision of the Supreme Court holding that such an affidavit is insufficient ... We are unable to bring ourselves to the conclusion that our exclusionary statute [now Art. 38.23, V.A.C.C.P.] and the affidavit before us here deprives an accused of due process under the Federal Constitution." (at 113–114).

In *Aguilar v. Texas,* supra, the Supreme Court of the United States, which was then a moderate court, granted certiorari, apparently because it was concerned about the different standards that then existed in the federal system and the state systems. It first pointed out in its opinion that "the Fourth 'Amendment's proscriptions are enforced against the States through the Fourteenth Amendment,' and that 'the standards of reasonableness are the same under the Fourth and Fourteenth Amendments.'" 84 S.Ct. at 1512. Relying upon its decisions of *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), *Nathanson v. United States,* 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933), and *Giordenello v. United States,* 357 & .S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), it ultimately held that for Fourth and Fourteenth Amendment purposes, to establish probable

cause in an affidavit for a search warrant, real facts, and not simply personal belief facts or conclusions, had to be stated in the affidavit for the search warrant before a valid search warrant could issue. Thus, the same standard for obtaining a search warrant in a federal cause, which was based upon hearsay information, that the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it was, and some of the underlying circumstances from which the affiant concluded that the informant, whose identity need not be disclosed, was "credible" or his information "reliable", would thereafter be applicable to obtaining a search warrant in a state case. The affidavit in *Aguilar*, supra, was found to be deficient because it failed to provide the magistrate a sufficient basis for a finding of probable cause.

After *Aguilar v. Texas*, supra, was returned to this Court, this Court did not choose to elaborate on or discuss what the Supreme Court had stated and held, opting instead to merely write an opinion that consists of only 20 lines, in which the following, which took up 4 lines of the opinion, was stated: "The holding of the Supreme Court requires that the conviction be set aside. The judgment is reversed and the cause is remanded." *Aguillar v. State*, 382 S.W.2d 480 (Tex.Cr.App.1964).

I pause to point out that a State court may not set standards below the minimum standards that are set by the Supreme Court of the United States in a particular area of the law, and by virtue of Article III of the Federal Constitution it is bound to enforce those minimum standards. However, State appellate courts are now and have always been free to interpret their respective constitutions and laws in a more liberal fashion than the way that the Supreme Court might interpret them under the federal constitution. See *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). It is necessary, however, in making such an interpretation, for the State court to make a plain statement indicating that the federal law did not compel the result, so that its decision will be immunized from federal review. See *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

When the Supreme Court held in *Aguilar v. Texas*, supra, that the reasonableness requirement of the Fourth Amendment had not been satisfied by the affidavit in that cause, thus causing it to be constitutionally deficient, Article III of the Federal Constitution required this Court's members to adhere to that holding.

*Spinelli v. United States*, supra, decided several years later, did not detract from what had been stated in *Aguilar v. Texas*, supra; it merely refined that decision, which, for purposes of federal constitutional law, became the law of the land as to the minimum standard that would govern in obtaining a search warrant.

The two pronged *Aguilar–Spinelli* test, as reflected by the many decisions of this and other courts that rejected claims that an affidavit was deficient, and lack of any real criticism by law enforcement authorities, is actually a quite simple test to pass. In order for a search warrant based on hearsay to issue under the test, "The magistrate must simply (1) be informed of the underlying circumstances from which it can be determined that the affiant received his information in a 'reliable' way and the magistrate must also (2) simply be informed of specific factual allegations from which the affiant concluded that the source was 'credible' or his information 'reliable.' Absent such factual allegations, there is not sufficient basis for a neutral magistrate to make an initial determination that probable cause exists." *Winkles v. State*, 634 S.W. 2d 289, 291 (Tex.Cr.App.1982) (On original submission).

For over twenty years, this Court religiously subscribed to what the Supreme Court had stated and held in *Aguilar v. Texas*, supra, and *Spinelli v. United States*, supra, which merely refined *Aguilar v. Texas*, supra.

In *Marquez v. State*, 725 S.W.2d 217, 233 (Tex.Cr.App.1987), in his almost unanimous opinion for the Court, which Judge Mc Cormick himself joined without any reserva-

tions or qualifications whatsoever, Judge W.C. Davis, the author of that opinion, correctly pointed out the following: "Since this State has always used the stricter Aguilar–Spinelli test for analyzing probable cause under Article I, Section 9 of the Texas Constitution we will review the instant affidavit using this approach." Judge McCormick, however, implicitly states in footnote 4 in his opinion, without acknowledging that most of what he states in his opinion is without authority and should be considered dicta, has the audacity to state that that holding "was unsupported by authority and is to be considered dicta." As easily seen, however, Judge Davis, in making the above statement, was merely recognizing on behalf of this Court what all but a few persons, which apparently did not then exclude Judge McCormick, were then fully aware of, that the "two pronged *Aguilar–Spinelli* test" had become written in stone as far as this Court was concerned.

History, but not Judge McCormick's opinion, teaches us that soon after *Aguilar v. Texas*, supra, was decided by the Supreme Court of the United States, the 59th Legislature of this State enacted a new Code of Criminal Procedure, which final product was primarily the effort of the State Bar of Texas' Special Committee for the Revision of the Code of Criminal Procedure. The Committee and the Legislature, obviously then aware of *Aguilar v. Texas*, supra, incorporated it into the Code of Criminal Procedure, which became effective January 1, 1966. Judge Fred Erisman, the chairman of the State Bar of Texas— Special Committee for the Revision of the Code of Criminal Procedure (Nov. 11, 1958– June 18, 1965), clearly pointed this out in his "Introduction to 1965 Revision Texas

Code of Criminal Procedure". Former Presiding Judge, then Judge Morrison, in his "Interpretive Commentary", further pointed this out when he stated the following: "The Committee merely incorporated the effect of ['the holdings by the Supreme Court which had invalidated two convictions from Texas because the affidavits for the search warrants did not contain sufficient facts to satisfy the magistrate that probable cause did in fact exist for the issuance of the warrant'][2] into the code so that such requirements would be made known and available to the local magistrates." Presiding Judge Onion, in his "Special Commentary", after expressly discussing *Aguilar v. Texas*, supra, stated the following: "The new Code has been reworded to meet these requirements." Presiding Judge Onion then gave suggestions as to how these requirements might be satisfied. Judge McCormick, implicitly if not expressly, states on page 163 of his opinion that because neither Judge Morrison nor Presiding Judge Onion quoted *Aguilar v. Texas*, supra, in its entirety, that this omission should permit the reader to conclude or infer that what they expressly stated in print was not what they actually meant to state in print. Judge McCormick states: "Nowhere do Judge Morrison or Judge Onion mention the two prongs of Aguilar or make any statement to the effect that such analysis was intended to be incorporated in the statute." I suppose this means that if one actually sees a rattler bite into his body, but fails to tell anyone that a rattler in fact bit him, that he was not really bitten by the rattler, notwithstanding that he almost died from the rattler's bite. Of course, if one takes the approach that Judge McCormick does,

---

**2.** The Supreme Court also reversed this Court's decision of *Etchieson v. State*, 372 S.W.2d 690 (Tex.Cr.App.1963), which had held that an affidavit which only stated that the belief of the affiant was based on the following was sufficient: "I have been informed of the existence of the foregoing set out facts by a reliable, credible, and trustworthy citizen of Dallas, Dallas County, Texas." See *Etchieson v. Texas*, 378 U.S. 589, 84 S.Ct. 1932, 12 L.Ed.2d 1041 (1964), which merely cited *Aguilar v. Texas*, supra. The Supreme Court also reversed this Court's deci-

sion of *Barnes v. State*, 390 S.W.2d 266 (Tex.Cr. App.1964), which had approved an affidavit for a search warrant which did not set out any basis for the affiant's belief and simply stated that the affiant believed that inside of the premises sought to be searched was unlawfully obtained money. The Supreme Court reversed, see *Barnes v. Texas*, 380 U.S. 253, 85 S.Ct. 942, 13 L.Ed.2d 818 (1965), *merely citing Giordenello v. United States*, supra, and *Aguilar v. Texas*, supra, as its authority.

then anything that was printed in the intervening 20 some odd years since *Aguilar v. Texas*, supra, was decided, was really not printed; such represents a mere illusion in the eyes of the reader, and should be ignored.

If that is the case, I suppose that we must disregard the law review article that then briefing attorney, now Judge McCormick wrote in 3 *St. Mary's Law Review* (1971), entitled "Search Warrants: The Requisites of Validity", in which he made the following suggestions in obtaining a search warrant: "2. Determine, whether, from reading the affidavit itself, an informant was involved. If an informant was involved, then apply the rules announced in *Aguilar* and *Spinelli*. 3. If no informant was involved then determine the sufficiency of the evidence in light of *Giordenello* and *Nathanson* [see my discussion of *Aguilar v. Texas, ante*]." (64).

I also suppose the same is applicable to the article written by Paul J. McClung in 28 *Texas Bar Journal* (1965), entitled "Recent Developments in Search and Seizure"; the article written by Clyde W. Woody and Marian S. Rosen in 11 *South Texas Law Journal* (1969–1970), entitled "Fourth Amendment, Viewed and Reviewed"; the article written by Saul W. Bernstein in 21 *Southwestern Law Journal* (1967), entitled "Criminal Law and Procedure"; the article written by Carol S. Vance in 10 *South Texas Law Journal* (1967–1968), entitled "The 1967 Amendments to the Texas Code of Criminal Procedure; A Prosecutor's Reflections"; and, of course, the article written by Presiding Judge Onion and his then briefing attorney Warren E. "Whizzer" White, that appeared in 10 *South Texas Law Journal* (1967–1968), entitled "Texas Code of Criminal Procedure-Its 1965 & 1967 Changes Affecting Corporation Courts & Police Practices", in which the following was stated: "As a direct result of *Aguilar*, a number of important changes were made in the 1965 Code of Criminal Procedure. Article 18.01 (1965), which defines a search warrant, added a new paragraph (now Article 18.01(b)) ... In order for the 'underlying circumstances' presented to the magistrate to be sufficient to

support probable cause, they must be based on either (1) the personal observations of the officer making the affidavit, or (2) the personal observations of a proven reliable informant, or (3) the personal observations of an informer whose reliability is unproven, plus corroborating observations made by the officer making the affidavit (i.e., underlying circumstances from which the officer concluded that the informant was credible and his information reliable)." (107).

In attempting to resolve the issue, I personally have found each of the above articles extremely helpful, and do not view them as either an illusion or something that can be ignored.

In 1983, in *Illinois v. Gates*, supra, the Supreme Court decided to abandon the "Aguilar–Spinelli two pronged test" in favor of an amorphous "totality of the circumstances" approach, under which nebulous and amorphous standard the issuing magistrate is now to make only a "practical, common-sense decision whether there is a fair probability" that the evidence sought will be found in the place to be searched. Thus, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, supra, 103 S.Ct. at 2332. This is the test that Judge McCormick, and those who join his opinion, vote for, which replaces the time-honored and time-tested two pronged test that *Aguilar–Spinelli* gave us, which this Court and law enforcement personnel have for over 20 years religiously subscribed to.

Thus, under *Gates*, supra, the rule today, for federal constitutional law purposes, whether probable cause to arrest or to obtain a warrant, which is based upon hearsay information, is found to exist is made by considering the totality of the circumstances set forth to arrive at a practical, common-sense decision as to whether there

is a fair probability that contraband or evidence will be found in a particular place. This, unquestionably, is a *lesser standard of proof* than that stated in the two pronged *Aguilar–Spinelli* test, and, because the States have the right to adopt a more liberal standard than the Supreme Court has adopted for federal constitutional law purposes, the main issue to be decided by this Court is whether it will continue to subscribe to the two pronged *Aguilar–Spinelli* test or will opt for the above amorphous "Gates test".

Judge McCormick states on page 163 of his opinion that *"This Court* had the opportunity to interpret Article 18.01(b), supra, in light of *Aguilar* in *Hennessy v. State,* 660 S.W.2d 87 (Tex.Cr.App.1983)." (My emphasis.) However, if one will take the time to peruse *Hennessy,* supra, he will easily see that Judge McCormick's statement, if it means or implies that that opinion was an En Banc opinion, is totally erroneous because that opinion was only a two judge panel opinion and was not an En Banc opinion of this Court.

Why is the rule now extant as a result of *Gates,* supra, so terribly wrong? Well, in the first place, it throws predictability and precision in judicial review of search and seizure cases, both warrantless and with warrant, to the winds, and fails to give law enforcement personnel any "bright line" guidance in performing their duties. E.g., *People v. Johnson,* supra. Thirdly, and just as important, a sought after change of our public policy to adopt the amorphous standard of *Gates,* supra, has not surfaced. To the contrary, although the Legislature has met in both regular and special session several times since *Gates,* supra, was decided, at no time has it enacted any legislation that might expressly repeal what it enacted after *Aguilar v. Texas,* supra, was decided, namely Art. 18.01(b), supra, which provision was not part of former Art. 304, 1925 Code of Criminal Procedure, the predecessor to Art. 18.01, supra, but was placed within Article 18.01, supra, solely as a result of *Aguilar v. Texas,* supra, being decided. As previously mentioned, Presiding Judge Onion and his then briefing attorney White many, many years ago wrote the following: "Article 18.01 (1965), which defines a search warrant, added a new paragraph which provides as follows: 'No search warrant shall issue for any purpose in this State unless a sworn complaint therefor shall first be filed with the issuing magistrate setting forth sufficient facts to satisfy the magistrate that probable cause does in fact exist for the issuance.' " Also see then briefing attorney, but now Judge McCormick's article, supra. Thus, the statutory provision of Article 18.01(b), supra, although expressly enacted as part of a comprehensive codification of search warrant practice and procedure, was actually a codification and adoption of the test enunciated in *Aguilar–Spinelli,* supra.

Because the two pronged *Aguilar–Spinelli* test has been written into our statutory law, albeit such only implicitly applies to warrantless arrests and searches, the issue here is whether the hearsay information that the arresting officer had when he arrested appellant was sufficient under the statute to establish probable cause. E.g., *People v. Sherbine,* 421 Mich. 502, 364 N.W.2d 658 (1985).

In *Eisenhauer IV,* supra, the case at bar, the court of appeals on remand first pointed out what was thought by many to be sacrosanct: "Under Texas law, an affidavit for a search warrant based upon hearsay must satisfy the two-prong test that the magistrate be informed of the underlying circumstances which render the information reliable and that he be informed of specific factual allegations which render the source of the information reliable. Tex.Crim.P. art. 18.01 (Vernon 1977); *Winkles v. State,* 634 S.W.2d 289 (Tex.Cr.App. 1982). *Glass v. State,* 681 S.W.2d 599 (Tex. Cr.App.1984)." (785). The court of appeals, in sustaining appellant's first and second grounds of error, which asserted "that appellant's arrest was without probable cause" and "there was insufficient evidence to establish the credibility of the informant", stated the following: "In the present matter, the officer testified that he had never received any information from the informant previous to the phone conversation of February 16, 1982. He had no

idea whether the information was accurate when he acted upon it, and he testified that the informant himself had never seen the cocaine the appellant was to obtain. According to the officer, all the informant knew was that 'a person was supposed to go to Miami and obtain some cocaine.' There was no testimony as to the credibility of the informant or even an affirmative showing that the officer had previously received information from the informant." (785).

Judge McCormick's opinion denigrates this Court's opinion of *Winkles*, supra, because it "contains no mention of any independent state grounds of review." I find that it is only if one has slept for over the past 20 years, or has not had a chance to read this Court's many opinions on the subject that have been handed down during the past 20 years, can one actually make this statement. Judge McCormick says that the court of appeals' citation to *Glass*, supra, "actually undermines the position of the Court of Appeals since *Gates*, and not *Aguilar*, is mentioned as an example of what is necessary to establish probable cause." (Page 163.) I find that it is only in the instance where one has not yet read that part of *Glass*, supra, which mentions *Illinois v. Gates*, supra, which is only mentioned once in the entire opinion, can one make the statement that Judge McCormick makes. In discussing why an anonymous telephone call, standing alone, will never provide sufficient facts that would authorize a warrantless arrest or search, which is per se unreasonable, and that "Something more is required before probable cause to make a warrantless arrest or search is shown to exist," I, as the author of that opinion for the Court, did state the following: "E.G., *Illinois v. Gates*, 462 U.S. 213 [227], 103 S.Ct. 2317 [2326], 76 L.Ed.2d 527, 541 (1983)". I did so only to point out and emphasize to the reader that an anonymous telephone call was much like the anonymous letter that existed in *Illinois v. Gates*, supra, which the Supreme Court itself expressly held would never be sufficient to establish probable cause. Thus, contrary to Judge McCormick's view, *Illinois v. Gates*, supra, was not cited

as an example of what is necessary to establish probable cause, but was cited, in the context of using information obtained from an anonymous source, such as from an anonymous telephone call or an anonymous letter, what would *not* be sufficient to establish probable cause. The court of appeals thus correctly cited *Glass*, supra, as authority in support of its statement.

Given what I have stated, because of what the Legislature enacted after *Aguilar v. Texas*, supra, was decided, and the authoritative comments pertaining thereto, it is unecessary to decide whether the Texas Constitution incorporates the concepts of the *Aguilar–Spinelli* test. E.g., *People v. Sherbine*, supra.

What really shocks me about Judge McCormick's opinion, in addition to what I have already stated, is the fact that he has long been the paradigmatic judge of this Court in dogmatically subscribing to the view that this Court should never be or act as a "Super Legislature", as seen by the dissenting opinions that he filed in *Long v. State*, 742 S.W.2d 302 (Tex.Cr.App.1987), "This Court has the obligation not to act as a super-legislature, substituting our opinion for that of the second branch of government. We have, instead, the responsibility to construe statutes in a constitutional manner where possible." (Citations omitted), and *Jackson v. State*, 718 S.W.2d 724, 728 (Tex.Cr.App.1986), "The majority today puts on its legislative caps and overrules precedent and in contravention of specific legislative intent ..." Today, however, it appears that Judge McCormick no longer subscribes to those views; otherwise it stands to reason, given what the Legislature has enacted in this area of the law, see Art. 18.01(b), supra, he would be writing a dissenting opinion to his own opinion.

Judge McCormick's opinion concludes that all his opinion is doing is keeping this Court "in [lock?] step with the federal constitutional model for probable cause determination." (Page 164.) However, if *Gates*, supra, and Judge McCormick's opinion are actually intended to be "role models for probable cause determination", then I find that the term "role model"

should be stricken from our dictionaries and our vocabularies.

To the tortured route that Judge McCormick takes to reach the conclusion that "The judgment of the Court of Appeals is reversed and the judgment of the trial court affirmed", I respectfully dissent with all of the vigor at my command. Also see Washington Irving, *The Sketch Book of Geoffrey Crayon, Gent.* (London, 1920), which concerns the story of what happened to the character Rip Van Winkle after he slept for twenty years.